**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0406-23

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

ASHON Q. MILLER &
TERRENCE M. MURRAY-LOACH,

    Defendants-Respondents.

_____

Submitted January 23, 2024 – Decided January 29, 2024

Before Judges Haas and Natali.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Ocean County, Indictment Nos. 22-05-0908 and 22-08-1535.

Bradley D. Billhimer, Ocean County Prosecutor, attorney for appellant (Samuel J. Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, Supervising Assistant Prosecutor, on the briefs).

Joseph E. Krakora, Public Defender, attorney for respondent Terrence Murray-Loach (Alexander R. Molloy, Assistant Deputy Public Defender, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for respondent Ashon Miller, joins in the brief of respondent Terrence Murray-Loach.

PER CURIAM

By leave granted, the State appeals from the Law Division's order granting defendants' motion to suppress the evidence a police officer seized during a search prompted by the officer detecting the smell of marijuana in the interior of their car. Because we conclude that additional factfinding is necessary, we reverse and remand.

I.

By way of background, the State attempted to justify its search under the automobile exception to the general requirement that law enforcement officers obtain a warrant before conducting a search of the person or private property of an individual. State v. Witt, 223 N.J. 409, 422 (2015). Under the automobile exception, a police officer may conduct a warrantless search of a motor vehicle during a lawful roadside stop "in situations where: (1) the police have probable cause to believe the vehicle contains evidence of a criminal offense; and (2) the circumstances giving rise to probable cause are unforeseeable and spontaneous." State v. Rodriguez, 459 N.J. Super. 13, 22 (App. Div. 2019) (citing Witt, 223 N.J. at 447-48).

At the time of the December 1, 2020 stop and search involved in this case, "New Jersey courts . . . recognized that the smell of marijuana itself constitutes probable cause that a criminal offense ha[s] been committed and that additional contraband might be present." State v. Walker, 213 N.J. 281, 290 (2013) (alteration in original) (internal quotation marks omitted) (quoting State v. Nishina, 175 N.J. 502, 515-16 (2003)). Thus, upon detecting the smell of marijuana, police were authorized "to conduct a warrantless search of the persons in the immediate area from where the smell [had] emanated." Nishina, 175 N.J. at 516 (alteration in original) (quoting State v. Vanderveer, 285 N.J. Super. 475, 481 (App. Div. 1995)).[1]

Before CREAMMA, the permissible scope of a search was restricted to areas "'strictly tied to and justified by' the circumstances which rendered its initiation permissible." State v. Patino, 83 N.J. 1, 11 (1980) (quoting Terry v.

---

[1] On February 22, 2021, the New Jersey Cannabis Regulatory Enforcement Assistance and Marketplace Modernization Act ("CREAMMA") became effective. As our Supreme Court recently explained, "CREAMMA . . . added a new section in the Criminal Code stating that . . . 'the odor of cannabis or burnt cannabis' . . . 'shall [not] constitute reasonable articulable suspicion of a crime' except on school property or at a correctional facility. N.J.S.A. 2C:35-10c." State v. Cohen, 254 N.J. 308, 328 (2023). Thus, the Court confirmed that N.J.S.A. 2C:35-10c "has no bearing" on searches that "predated the passage of CREAMMA[.]" Ibid.

Ohio, 392 U.S. 1, 19 (1968)).  The Supreme Court recently applied this principle concerning the proper scope of an automobile search in Cohen.

In that pre-CREAMMA case, the police stopped the defendant's car for a motor vehicle violation.  Cohen, 254 N.J. at 314.  As they approached the car, they detected the "general smell" of then-illegal raw marijuana, although they could not pinpoint which area(s) within the car were the source(s) of that odor.  Id. at 325.  The police also observed what appeared to be marijuana in the driver's beard.  Id. at 314.  They searched the car's passenger compartment for marijuana, but they found no drugs or contraband there.  Id. at 315.  At that point, the police searched the car's trunk and under the engine hood and discovered two guns under the hood.  Ibid.  The Court invalidated the search that went beyond the passenger area of the car because the general smell of marijuana was inadequate, in and of itself, to justify a further warrantless intrusion outside the interior of the car.  Id. at 327.

The Court provided guidance for the resolution of other pre-CREAMMA cases.  As a general rule, the Court held that searches that extend beyond the passenger compartment of a car must be justified by "facts indicating something more than simply detecting the smell of marijuana from the interior of the car."

A-0406-23

Id. at 324. In other words, the smell of marijuana by itself can only provide probable cause for a search of the interior of the car. The Court stated:

> This holding in no way suggests that areas within the interior of the car would require separate probable cause findings in order to conduct a warrantless search. We are not dividing up the interior of vehicles such that an officer would need to establish different or additional probable cause to search the front seat as opposed to the back seat, for example. Pursuant to the automobile exception, if an officer has probable cause to search the interior of the vehicle, that probable cause encompasses the entirety of the interior.
>
> [Id. at 327.]

However, if the police wish to extend the search beyond the interior of the car, they must be able to point to "unique facts" beyond the mere smell of marijuana that establish probable cause to look into other areas of the vehicle. Id. at 324. The Court explained:

> We are also not suggesting that the warrantless search of a trunk or engine compartment will always require separate probable cause findings. Instead, we reiterate that a warrantless search of a car "must be reasonable in scope" and "strictly tied to and justified by the circumstances which rendered its initiation permissible." Patino, 83 N.J. at 10-11. However, a generalized smell of raw marijuana does not justify a search of every compartment of an automobile.
>
> [Id. at 327-28.]

5

II.

With the governing legal principles in mind, we return to the case at hand.[2] An Ocean County grand jury returned an indictment charging defendants Ashon Miller and Terrence Murray-Loach with second-degree unlawful possession of a firearm, fourth-degree possession of a large capacity ammunition magazine, and fourth-degree unlawful possession of a prohibited weapon. In a fourth count, the indictment charged Murray-Loach with second-degree certain person not to possess a firearm. The charges were based upon a search of defendants' car, which resulted in the seizure of a defaced handgun with a seventeen-round capacity magazine and twenty cyclobenzaprine hydrochloride pills. Defendants filed a motion to suppress the seized items.

The trial judge conducted a one-day evidentiary hearing. Officer Austin Spagnola was the State's only witness and defendants did not present any testimony. Spagnola provided the following account of his search at the hearing.

Around 12:30 a.m. on December 1, 2020, Spagnola observed a red Nissan sedan with Pennsylvania license plates following a white Ford sedan too closely in the left lane. Spagnola began to follow the two cars. As he did, he "detected

---

[2] The offenses involved in this case occurred on December 1, 2020. Therefore, like Cohen, this matter is a pre-CREAMMA case.

A-0406-23

the odor of burnt marijuana" coming from the cars in front of him.[3]  Spagnola followed the cars for about thirty blocks and then executed a motor vehicle stop of the Nissan for the traffic violation of following too closely and because he smelled marijuana emanating from it.[4]

Spagnola approached the Nissan and saw that the front windows were down.  He smelled burnt marijuana.  Miller was driving the car and Murray-Loach was in the passenger seat.  Both men were cooperative.  After reviewing Miller's driver's license and registration, Spagnola called for a backup unit.  It arrived a few minutes later.

Spagnola then asked defendants to exit the car.  They cooperated.  Spagnola searched the men "for weapons and contraband," but found nothing.  Spagnola continued to smell marijuana coming from the car.  Based upon the smell of marijuana, Spagnola began to search the interior of the vehicle.

Spagnola started in the front passenger side of the car, including the glove compartment.  He then proceeded clockwise around the vehicle by moving next

---

[3]  Spagnola had been "trained in the detection of the odors of [Controlled Dangerous Substances], specifically . . . [b]urnt and raw marijuana."

[4]  Spagnola radioed another officer to pull over the Ford sedan.  The officer stopped that car about two blocks further up the road.  The officer found marijuana in the Ford sedan.

to the rear passenger side, to the rear driver's side, and then to the front driver's side of the car. This search took approximately three minutes.

Spagnola testified that he found nothing of evidentiary value in the front of the car. However, in the back seat he found "two pairs of bolt cutters, a ski mask and a pair of gloves, which [Spagnola] believed were commonly associated with burglar tools." Spagnola testified he was not aware of any reported burglaries in the area that evening.

Spagnola could still smell marijuana. Based only on that smell, he searched the Nissan's trunk. Because there were a number of different items in the trunk, this search took approximately six-and-a-half minutes to complete. Spagnola found a prescription pill bottle and some suspected prescription pills in the trunk. He did not find any marijuana.

However, the marijuana smell persisted. Spagnola testified that because he "hadn't found any marijuana yet and [he] could smell the marijuana[,]" he returned to the front passenger seat area of the car to perform "another sweep."

After he went into the passenger side front door with his flashlight, Spagnola said he saw for the first time that the side panel of the center console[5]

_____

[5] Spagnola described the location of the panel as follows: "I observed on the side of the center console on the passenger side, the panel, if you were sitting in

had "tool marks" on it, which the officer described as "[d]ents and scratches on the plastic [panel] itself." Spagnola testified that the panel "wasn't properly put back, so there was a gap behind it . . . ." Spagnola testified that he had been trained at the police academy to identify hidden compartments, which he called "traps," that were used to hide contraband in cars. He could tell that the panel had been "manipulated before." Based upon the dents and scratches on the panel, the fact that the panel was separated from where it should have been, the visible gap behind the panel, and the continued smell of marijuana inside the car, Spagnola believed he had located a "trap."

Spagnola testified that because of the gap behind the panel, he "just had to pull it back a little bit, and [he] could see that there was a firearm behind there." Spagnola testified that he put his fingers into the gap behind the panel and pulled it back. He did not use any tools to accomplish this.

After he removed the gun, Spagnola found that it was loaded, had a large capacity magazine, and no serial numbers. Spagnola arrested both defendants.

The entire search of the car from beginning to end had taken approximately fifteen minutes. No marijuana was found.

---

the passenger side, the panel that would be touching your left leg, it had tool marks on it and it wasn't properly put back on to the vehicle."

A-0406-23

Spagnola's written report of the incident did not provide the details of the search the officer related in his testimony at the hearing. Instead, the report merely stated that "[a] full and complete search of the vehicle was completed." There was no mention of the discovery of the panel, the tool marks on it, or the gap behind it. Spagnola also did not describe in the report how he accessed the handgun behind the panel. Although the report states that photographs of defendants' vehicle were taken, the State did not introduce those photographs into evidence at the hearing.

Spagnola's patrol car was parked behind defendants' vehicle, and the search was recorded on the car's dash camera. The State played the Mobile Vehicle Recording (MVR) of the search at the hearing. We have reviewed the MVR. It shows Spagnola going into defendants' car as he conducted his search, opening and searching the trunk, and returning to the front passenger door. The MVR does not depict anything that occurred inside the car.

At some point during the incident, a sergeant arrived at the scene, apparently to provide supervision. At approximately the thirty-minute, fifty-second mark of the MVR, Spagnola tells someone off camera: "There was a handgun in this car. It was underneath the plastic panel in the front of the car. I popped it open because it was loose and there's a handgun under there."

10

Spagnola and the sergeant then walk to the front passenger door of the car, and look in. Spagnola tells the sergeant: "All the panels in the car are loose. I popped this panel here."

At the forty-four minute, thirty-nine second mark of the MVR, Spagnola and the sergeant return to the front passenger door. Spagnola states:

> I searched the whole car, got into the trunk and seen all the stuff and the ski mask in the back seat. You know what, let me go pop that plastic off that panel in the front because it looked loose. And that's where I found it. You see that plastic that's gone here?

The sergeant replied, "I saw. Is that where it was, right there?" Spagnola told the sergeant, "In that little cubby, yeah. And it had everything pushed up against it."

On cross-examination, defendant Miller's attorney played a portion of the MVR that depicted Spagnola searching the front passenger side of the car. The following colloquy occurred:

> Q: Okay, you said you popped open the panel, correct.
>
> A: Correct.
>
> Q: What do you mean by that? Is that when you pulled it open?
>
> A: I guess that's the motion I did use, yes.

11

Q:    Okay.

A.    I pulled it open and I could see the gun there.

At the fifty-one minute mark of the MVR, the officers are looking inside the front driver's side door. They find wires that Spagnola states appear to have been "spliced." The sergeant asks whether the car may have been "hotwired," while Spagnola presents a possible explanation that the wires may be associated with a "trap." At no point on the MVR does Spagnola state that the panel where the gun was found was a "trap."

Thus, there are several inconsistencies between the statements Spagnola made at the scene on December 1, 2020 and his testimony at the suppression hearing. On the one hand, Spagnola stated during the incident that he saw that the panel was loose and that he "popped" the plastic off the panel and found the gun. At the suppression hearing, however, he stated he noticed tool marks on the panel and saw "there was a gap behind it." From his training, he testified he believed the panel was a "trap" containing the marijuana that he smelled. Spagnola testified he "just had to pull [the panel] back a little bit, and [he] could see that there was a firearm behind there." He did not testify that he "popped" the panel off or removed it from the car.

12                                                                                                          A-0406-23

Unfortunately, the trial judge did not clearly resolve these conflicting statements in deciding to grant defendants' suppression motion and she did not provide the same level of detail as we have set forth above. The judge began her written decision by making very strong credibility findings in Spagnola's favor. The judge stated:

> Upon review of the MVR footage and in consideration of the testimony provided, the court finds Spagnola's testimony credible. He maintained direct eye contact while being questioned. He was forthright in his answers on both direct and cross[-]examination, and he was not evasive in his answers. He was able to describe the area in which the stop took place, certain observations leading up to the stop of the subject vehicle, and his narrative was largely corroborated by video evidence.

The trial judge ruled that because Spagnola searched the trunk of the car based solely on the smell of marijuana coming from the car, the pills found there had to be suppressed under Cohen. The State does not challenge that ruling on appeal.

However, the judge also suppressed the handgun found behind the console panel. The judge ruled that Spagnola's

> search of the . . . "side panel" area exceeded the permissible constitutional scope authorized by the automobile exception, particularly in light of Officer Spagnola's manipulation of a panel in the vehicle that he acknowledges was not designed to be removed. Not

only did Officer Spagnola interfere with the structure of the passenger compartment when he "popped" the panel off, the officer's statement on the scene indicates that the "loose" appearance of the panel was consistent with other panels in the vehicle. Though the officer indicated that he observed "tool marks" on the panel, nothing in the record suggest to the court that the officer was acting on more than a hunch when expanding the search based on a generalized odor into closed compartments and even the internal structure of the vehicle.

The State thereafter filed a motion for reconsideration, which the trial judge granted in order "to provide more specific reasoning under the recently decided" Cohen case. After revisiting its prior decision, however, the judge again suppressed the handgun. The judge stated that she could

> not find under the totality of the circumstances, including consideration given to testimony describing marks on the panel, that the State established sufficient probable cause by a preponderance of the evidence to expand the scope of the search by interfering with the structure of the passenger compartment in order to gain access to the internal structure of the vehicle. Probable cause to search the entirety of the interior or passenger compartment does not necessarily extend to whichever internal zones of the vehicle may be accessed by dismantling the vehicle components from therein.

We subsequently granted the State's motion for leave to appeal.

14

On appeal, the State argues that the trial judge "erred in finding the search of the panel in the interior of the vehicle concealing a secret compartment to be beyond the scope of the automobile exception." However, we are unable to address this contention because the trial judge did not adequately resolve the factual discrepancies between Spagnola's remarks at the scene and his subsequent suppression hearing testimony.

Our review of a trial court's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). In reviewing a motion to suppress evidence, we must uphold the court's factual findings, "so long as those findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (quoting Robinson, 200 N.J. at 15). Additionally, we defer to findings that are "substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Ibid. (alteration in original) (quoting Robinson, 200 N.J. at 15). We do not, however, defer to a trial court's legal conclusions, which we review de novo. Ibid.

However, "'where the focus of the dispute is . . . alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn

15

therefrom,' the traditional scope of review is expanded." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)).  In those circumstances, we must reverse a trial judge's determination where his or her findings go "so wide of the mark that a mistake must have been made."  Ibid. (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

Applying these standards, we are unable to reconcile the trial judge's findings in this matter.  As noted above, Spagnola testified that upon entering the front passenger side door of the car for a second time, he noticed tool marks on the side panel and an open gap behind it.  Spagnola testified he believed this might have been a "trap" designed to conceal contraband.  He did not testify that he "popped" the panel off or removed it.  Instead, he explained that he pulled the panel toward him with his fingers and saw the gun inside.

Spagnola's statements at the scene did not contain this level of detail.  He did not mention the tool marks or the suspected "trap" on the passenger side panel.  He did not state that he pulled the panel toward him and saw the gun before he retrieved it from behind the panel.  In his comments to the sergeant, Spagnola merely stated that all the panels in the car were "loose" and he

16

"popped" off the plastic of the panel next to the front passenger seat and found the gun. Thus, the narrow actions Spagnola described he took at the scene were certainly more intrusive on their face than the more detailed steps Spagnola recounted at the suppression hearing.

To further cloud the issue, the only time that the parties addressed the apparent discrepancies with Spagnola at the suppression hearing was during cross-examination when defense counsel asked the officer what he meant by saying he "popped open the panel." At that point, Spagnola explained that he "pulled it open and [he] could see the gun there."

From the statements made in her written decision, it appears the trial judge relied more upon Spagnola's statements at the scene and rejected his explanation of his actions at the suppression hearing. However, the judge found all of Spagnola's testimony to be credible. If Spagnola's suppression hearing testimony was credible, he was concerned about a "trap" that his training taught him would be evidenced by the tool marks he stated he saw on the panel and the fact that the panel looked like it had previously been manipulated. The gap he saw behind the panel allowed him to move the panel toward him with his fingers and see the gun. Based on that testimony, if indeed it was credible, Spagnola's search may have been permissible under our decision in State v. Nunez, 262 N.J.

17

Super. 251 (App. Div. 1993)[6] and the Supreme Court's decision in <u>Cohen</u>.[7]

Conversely, a different result might be required if the judge specifically found that Spagnola's claim that he suspected that the tool marks on, and the gap behind the panel indicated it was a "trap" that could contain marijuana was not credible, or that Spagnola saw the loose panel, did not peek behind it, and simply yanked if off the car hoping to find contraband.

In short, the trial judge's crediting of the entirety of Spagnola's testimony cannot be harmonized with her conclusion that the officer was acting on no more than "a hunch" when he either pulled back the panel with his fingers to look

_____

[6] In <u>Nunez</u>, a trooper conducting a warrantless search pursuant to the automobile exception noticed a half-inch gap under the rear window on the passenger side of the defendant's car. <u>Id.</u> at 254. The trooper had training and experience that had taught him to identify hidden compartments in vehicles, much like Spagnola testified to having undergone at the police academy. <u>Ibid.</u> By forcing his fingers and arm into the gap, the trooper in <u>Nunez</u> was able to retrieve a plastic shopping bag that contained cashier checks totaling $31,000 and cocaine. <u>Ibid.</u> Under the totality of these circumstances, we found that "as a result of the officer's training and experience, the trooper had reason to believe that the vehicle contained secret compartments." <u>Id.</u> at 256. Therefore, the search was justified under the automobile exception despite any physical manipulation of the structural interior of the car. <u>Ibid.</u>

[7] Spagnola's discovery of the "trap" might have also given him the extra justification <u>Cohen</u> dictates is needed, beyond smelling marijuana, to look behind the panel, pull it forward with his fingers, and find and seize the gun hidden behind it, if indeed that is how the search actually occurred. <u>Cohen</u>, 254 N.J. at 324.

inside, or "popped" it off from the car without already knowing there was a gun behind it. The judge did not explain why she seemingly accepted only a portion of Spagnola's "credible" testimony and she did not make detailed findings as to how Spagnola actually retrieved the gun from behind the panel.

Accordingly, a remand is required. Because we are concerned that the judge would have a commitment to her previous view of the evidence, in fairness to her and the parties, we direct that a new suppression hearing occur before a different judge. Nothing within this opinion forecasts any views on the merits of the State's suppression motion nor on the question of whether defendants may be entitled to prevail on the issues once they are fully considered by the trial court and adequate findings of fact and conclusions of law are made.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION